UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| CHARLENE P. LEON, individually, and as a representative of a Class of Participants and Beneficiaries of the Maersk Inc. Pension, <br><br> Plaintiff, <br><br> v. <br><br> MAERSK INC. <br><br> and <br><br> BOARD OF DIRECTORS OF MAERSK INC., <br><br> and <br><br> PENSION COMMITTEE OF MAERSK INC., <br><br> Defendants. | Civil Action No. <br><br> CLASS ACTION COMPLAINT PURSUANT TO 29 U.S.C. § 1132(a)(2) |

COMES NOW Plaintiff, Charlene P. Leon ("Plaintiff"), individually and as representative of a Class of Participants and Beneficiaries of the Maersk Inc. Pension (the "Plan" or "Maersk Plan"), by her counsel, WALCHESKE & LUZI, LLC, and FITZGERALD, HANNA & SULLIVAN, PLLC, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

**INTRODUCTION**

1. As the Fourth Circuit has maintained, "[t]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are ... the highest known to the law." *Tatum v. RJR Pension Inv. Comm.,* 761 F.3d 346, 356 (4th Cir.2014).

2. Defendants, Maersk Inc. ("Maersk"), the Board of Directors of Maersk Inc. ("Board"), and the Pension Committee of Maersk Inc. ("Pension Committee") (collectively "Defendants"), are

fiduciaries under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* as they exercise discretionary authority or discretionary control over the 401(k) defined contribution retirement plan – known as the Maersk Inc. Savings Plan (the "Plan" or "Maersk Plan") – that it sponsors and provides to its employees.

3.      During the putative Class Period (September 22, 2017, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA)] fees," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739-740 (2022), and by failing to remove their high-cost recordkeeper, John Hancock Retirement Plan Services ("John Hancock").[1]

4.      Plaintiff is a "participant" of the Plan under ERISA Section 3(7), 29 U.S.C. § 1002(7).

5.      The Plan is a Section 401(k) "defined contribution" retirement plan under 29 U.S.C. § 1002(34), meaning that Maersk's contributions to the payment of Plan costs is guaranteed but the retirement benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, *less expenses*." *Tibble v. Edison Int'l,* 575 U.S. 523, 525 (2015) (emphasis added.)

6.      Maersk and its Board are the Plan Sponsor of the Plan.

7.      Maersk and its Board assigned Plan administrator fiduciary duties to the Pension Committee and its individual members.

8.      Plaintiff alleges two ERISA violations against Defendants: a violation of the duty of prudence and loyalty against the Pension Committee under 29 U.S.C. § 1104(a)(1)(B) for charging Plan participants excessive and discriminatory Total recordkeeping and administrative ("RKA") fees,

---

[1] Based on Form 5500s dating back to 2015, John Hancock has been the recordkeeper of the Plan for eight years or more.

and a claim against Maersk and its Board of Directors for failure to monitor fiduciaries on the Pension Committee with regard to Plan Total RKA fees.

9.      More specifically, Count I alleges a breach of the fiduciary duty of prudence and loyalty by Defendant Pension Committee for incurring unreasonable and discriminatory Total RKA fees. Among other things, the Pension Committee *paid over an 305% premium* per-participant for Total RKA fees for the Plan to the Plan recordkeeper, John Hancock, during the Class Period, and discriminate in the amount of Total RKA fees charged between Active Participants who are employees and Non-Active Participants who are former employees with Plan account balances.

10.     The Pension Committee should have lowered its Total RKA fees by soliciting bids from competing providers and using its massive size and correspondent bargaining power to negotiate for fee rebates, but it did not do so, or did so ineffectively, during the Class Period.

11.     Counts II alleges a breach of fiduciary duty by Maersk and its Board for failing to monitor those members of the Pension Committee responsible for paying these unreasonable and discriminatory Total RKA fees.

12.     Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of loyalty in the best interest of Plan participants, 29 U.S.C. § 1104(a)(1)(A), and their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

13.     The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 575 U.S. at 529; *DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 423 (4th Cir.2007) ("The duty of a fiduciary to act with prudence includes a duty

to initially determine, and continue to monitor, the prudence of each investment option available to plan participants."). This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*"); *Forman v. TriHealth, Inc.*, 40 F.4th 443, 449 (6th Cir. 2022).

14.     Plan fiduciaries have a continuing duty to monitor their RKA fees to make sure that they are not excessive with respect to the services received. *See DiFelice*, 497 F.3d at 423.

15.     Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes II*, 63 F.4th at 625-626.

16.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Total RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

17.     There is no requirement to allege the actual inappropriate fiduciary actions taken because a breach of fiduciary duty claim under ERISA can survive a motion to dismiss without "well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the [plan fee] at issue was improvident." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)).

18.     The unreasonable Total RKA fees paid inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Total RKA services,

given their level and quality, were improvident. The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F.4th at 628.

19.     There is no "obvious alternative explanation that suggests [that Defendants'] conduct falls within the range of reasonable judgments a fiduciary may make based on [their] experience and expertise." *Id.* at 635. Defendants' fiduciary decisions fall outside the range of reasonableness. *Id.* at 630, 633.

20.     These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees.

21.     To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

23.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

24.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

25.     In conformity with 29 U.S.C. §1132(h), Plaintiff served this Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

26.     Plaintiff, Charlene P. Leon, is a resident of the State of South Carolina and currently resides in Indian Lane, South Carolina, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

27.     Plaintiff held numerous position in export customer service and port support at mostly the Maersk location at 9300 Arrow Point Blvd., Charlotte, NC 28273, from September 1997 through February 2023.

28.     During the Class Period, Plaintiff invested in the PIMCO Total Return, Eaton Vance Atl/SMID-Cap R6, American EuroPacific Growth R6, Blackrock LP Index 2020Q, Hotchins Lrg Cap Val Sep Acct, and T Rowe Price Lrg Cap Growth I. Plaintiff rolled out of the Plan in 2021.

29.     Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered actual injuries to her Plan account through paying excessive Total RKA fees during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining John Hancock as its recordkeeper, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and Class.

30.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injuries.

31.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Total RKA fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

32.     Having never managed a massive 401(k) Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

33.     Maersk is a Danish international container shipping company. Founded in 1928, it is the world's second largest container shipping company by both fleet size and cargo capacity, offering regular services to 374 ports in 116 countries. On the Plan's 2021 5500 form filed with the Department of Labor ("DOL"), Maersk lists its United States headquarters as 180 Park Avenue, Florham Park, NJ 07932, and it has a large facility, at which Plaintiff worked, at 9300 Arrow Point Blvd, Charlotte, NC 28273. In this Complaint, "Maersk" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

34.     Maersk acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Maersk and its Board appointed other Plan fiduciaries on the Pension Committee and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.  For these reasons, Maersk and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

35.     The Plan is administered by the Pension Committee. As the Plan Administrator, the Pension Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Pension Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

36.     In 2021, the Plan had $766,546,315 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had more bargaining power regarding Plan fees and expenses most other 401(k) Plan in the United States. Defendants, however, did not regularly monitor John Hancock to ensure that John Hancock remained the prudent and objectively reasonable choices to provide Total RKA services, as illustrated by not reducing its Total RKA fees.

37.     With 4,099 participants in 2021, the Plan had more participants than 99.60% of the defined contribution plans in the United States that filed 5500 forms for the 2021 Plan year. Similarly,

with $766,546,315 in assets in 2021, the Plan had more assets than 99.77% of the defined contribution plans in the United States that filed 5500 forms for the 2021 Plan year.

## RECORDKEEPING AND ADMINISTRATION ("RKA") SERVICES AND FEES

38. Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

39. Defined contribution plan fiduciaries of 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of massive retirement plans with a prudent and materially identical level and caliber of services. John Hancock is one such recordkeeper.

40. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to defined contribution plans like the Maersk Plan.

41. All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide materially similar RKA services to maintain the same profit margin rate.

42. There are three types of RKA services provided by all recordkeepers.

43. The first type, "Bundled RKA," include:

   a. Recordkeeping;

   b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

   c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.     Maintenance of an employer stock fund;

f.     Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.     Plan consulting or investment services including assistance in selecting the investments offered to participants;

h.     Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.     Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.     Compliance testing to ensure the plan complies with Internal Revenue non-discrimination rules; and

k.     Trustee/custodian services.

44.     According to the August 31, 2022 Maersk Inc. Savings Plan Participant Disclosure Notice under ERISA Section 404(a)(5), "[t]he plan may pay service providers for administrative services rendered during the year, such as recordkeeping and investment advisory services. Service providers may offset the fees they would otherwise charge with revenue sharing payments that the service provider receives in connection with plan investment options, otherwise their service fees may be paid from a segregated account under the plan and/or may be charged against participants' or beneficiaries' accounts on a pro rata basis, per capita basis, or as a specific dollar amount, subject to the terms of the plan. In some circumstances, portions of such payments may be credited back to your account.

Any amounts charged or credited against your account will be disclosed online and in your statement on a quarterly basis."

45.     This is the same boilerplate language that John Hancock uses for all its massive plans it recordkeeps. There is nothing in the documents provided to Plan participants to suggest that there is anything exceptional, unusual, or customized about the Bundled RKA services provided to Maersk Plan participants by John Hancock.

46.     The Plan provided participants all the commoditized and fungible Bundled RKA services provided to all other massive 401(k) plan participants. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by John Hancock. Any differences in these Bundled RKA services are immaterial to the price quoted by recordkeepers for such services.

47.     Failing to adjust fee arrangements, solicit bids, or negotiate for rebates with existing recordkeepers, violates a fiduciary's duty of prudence under ERISA. *See Hughes II*, 63 F.4th at 625-626.

48.     According to the August 31, 2022 Maersk Inc. Savings Plan Participant Disclosure Notice under ERISA Section 404(a)(5), the Plan states:

| | |
|---|---|
| Per Participant Fee - Active Participants (balance < $5,000) | $0.00 |
| Per Participant Fee - Active Participants (balance $5,001 - $79,999) | $31.50 |
| Per Participant Fee - Active Participants (balance $80,000 - $299,999) | $78.50 |
| Per Participant Fee - Active Participants (balance > $300,000). | $236.50 |
| Per Participant Fee - Non-Active Participants (balance $100 - $299,999) | $112.50 |
| Per Participant Fee - Non-Active Participants (balance > $300,000) | $375.00 |

49.     Based on Plaintiff's quarterly account statements, between September 2017 and December 2022, John Hancock in fact charged Plaintiff between $78.50 annually and $236.50 annually per year deducted quarterly per participant for *Bundled* RKA.

50. Non-Active participants were discriminated against by the Plan by being charged even more for accounts larger than $100,000, even though the Plan had less work to do on their behalf because they were former employees with Plan account balances.

51. Although plan sponsors have broad discretion in determining how to allocate plan fees and expenses, charging different fees to active and terminated employees runs afoul their duty of loyalty and prudence under ERISA.

52. It is unreasonable and a violation of their fiduciary duty of loyalty and prudence to have Non-Active participants subsidize the cost of administration for the Active participants.

53. Under both DOL and IRS guidance, DOL Field Assistance Bulletin (FAB) 2003-3; Rev. Ruling 2004-10, charging Non-Active participants unreasonably high RKA fees, as here, impairs their continued plan participation, and is prohibited under ERISA fiduciary standards. *See* Vanguard, *Slicing and dicing retirement plan fees: Allocation consideration for plan sponsors* 6 (December 2018).

54. Since well before 2017, industry experts have maintained that for massive retirement plans like the Maersk Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price.

55. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

56. Because RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for massive plans like the Maersk Plan.

57.     RKA services are essentially fungible and the market for them is highly competitive. This highly competitive RKA market is filled with equally capable recordkeepers, similar to John Hancock, who can provide comparable Bundled RKA services for less if only asked to provide bids to plans like the Maersk Plan.

58.     Given the mammoth size of the Maersk Plan, the same price paid by the Maersk Plan for Bundled RKA over the Class Period, and the trend of price compression for Bundled RKA over the last six years, it is possible to infer that Defendants did not engage in any competitive solicitation of RKA bids, or only ineffective ones, breaching ther fiduciary duties of prudence.

59.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

        a.      Loan processing;

        b.      Brokerage services/account maintenance;

        c.      Distribution services; and

        d.      Processing of Qualified Domestic Relations Orders (QDROs).

60.     According to the August 31, 2022 Maersk Inc. Savings Plan Participant Disclosure Notice under ERISA Section 404(a)(5), the Plan provided all such standard A La Carte usage services as other similar massive 401(k) plans do.

61.     The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

62. According to the August 31, 2023 Maersk Inc. Savings Plan Participant Disclosure Notice under ERISA Section 404(a)(5), the Plan paid all the standard Ad Hoc RKA fees set out above and just like other comparable massive plans do.

63. The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the Total RKA fees.

64. Total RKA fee numbers represent the best methodology for determining apples-to-apples comparisons of plans as far as what is being charged for Total RKA.

65. The methodology utilized in this Complaint for calculating the Total RKA for both the Maersk Plan and for all the comparison plans discussed below contains the following seven steps:

    a. taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

    b. reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

    c. reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

    d. Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

    e. utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

    f. reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information

that can determine each plan's pricing structure and whether revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g. reviewing the results for reasonableness and make revisions as appropriate based on Plaintiff's non-testifying experts experience in evaluating plans at the different recordkeepers.

66. Because the Total RKA offerings are fungible among all recordkeepers who provide services to massive plans, like the Maersk plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the recordkeeper's "revenue requirement" is on a per participant basis for providing the Total RKA services.

67. This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

68. Fidelity, the largest 401k recordkeeper in the country, has in fact conceded in another recent case that the Total RKA services that it provides to other massive plans are commodified, including the plan services provided to its own employees.

69. As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in*

*assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

70.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

71.     Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

72.     The Maersk Plan paid both direct and indirect RKA fees during the Class Period to John Hancock.

73.     With regard to the comparison plans, either they had indirect and direct compensation as described below or only direction compensation for RKA services.

**ERISA Fiduciary Standards For Selecting and Monitoring Recordkeepers**

74.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

75.     Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of Total RKA fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

76.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

77.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary.

78.     An internal benchmarking survey from CapTrust, Fiduciary Decisions/Benchmarks, or similar company, is inadequate to determine a reasonable Total RKA fee. Such benchmarking surveys skew to higher "average prices," that favor inflated Total RKA fees. To receive a "reasonable" Total RKA fee in the prevailing market, prudent plan fiduciaries should engage in solicitations of competitive bids on a periodic basis.

79.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA fees. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

80.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

81.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

82.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

83.     Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626.

## THE PLAN PAID UNREASONABLE TOTAL RKA FEES TO JOHN HANCOCK DURING THE CLASS PERIOD

84.     A plan fiduciary must continuously monitor its Total RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees become unreasonable. *See Hughes*, 142 S. Ct. at 742.

85.     During the Class Period, Defendant Pension Committee egregiously failed to monitor the Plan's Total RK&A fees paid to John Hancock.

86.     During the Class Period, Defendant Pension Committee failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to John Hancock, in order to avoid paying unreasonable Total RKA fees.

87.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendant Pension Committee followed a fiduciary process that was ineffective given the objectively unreasonable Total RKA fees it paid to John Hancock and in light of the level and quality of Total RKA services it received that were materially similar to services available through other recordkeepers and provided to other massive plans.

88.     As set forth in the table below, from the years 2017 through 2021, based upon information provided in 5500 Forms filed with the DOL and by the Plan fiduciaries to Plan participants in the Participant Required Fee Disclosures under Section 404(a)(5), the Plan paid an effective average annual Total RKA fee of $190 per participant.

## Total Recordkeeping and Administration (Total RKA) Fees

|  | 2017 | 2018 | 2019 | 2020 | 2021 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 3,159 | 3,278 | 3,465 | 3,469 | 4,099 | *3,494* |
| **Est. Total RKA Fees** | $593,742 | $644,200 | $635,200 | $668,533 | $779,791 | *$664,293* |
| **Est. Total RKA Per Participant** | $188 | $197 | $183 | $193 | $190 | *$190* |
| **Reliable Est. of Reasonable Total RKA Fees** | $148,473 | $154,066 | $162,855 | $163,043 | $192,653 | *$164,218* |
| **Reliable Est. of Reasonable Total RKA Fees Per PP** | $47 | $47 | $47 | $47 | $47 | *$47* |

89.     The table below illustrates the annual Total RKA fees paid by other comparable plans of similar size, receiving a materially similar level and quality of Total RKA services in 2018.

### 2018 Comparable Plans' Total RKA Fees Based on Publicly Available Information - Form 5500

(Price calculations are based on 2018 Form 5500 information)

| Plan | Partici-pants | Total RKA Fee | Total RKA Fee /pp | Record-keeper |
|------|------|------|------|------|
| Genesco Salary Deferral Plan | 2,695 | $138,207 | $51 | Great-West |
| IBERIABANK Corporation Retirement Savings Plan | 3,193 | $127,723 | $40 | Prudential |
| **Maersk 2018 Plan Fee** | **3,278** | **$644,200** | **$197** | **John Hancock** |
| Associated Materials, LLC 401(K) Retirement Plan | 3,639 | $179,475 | $49 | ADP |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund | 4,369 | $185,805 | $43 | Vanguard |

90.     To determine the Total RKA fees that other comparable plans are paying, Plaintiff considered both the direct and indirect compensation collected by recordkeepers as disclosed on publicly available Form 5500s.

91.     To ensure meaningful and apples-to-apples comparisons, Plaintiff used the same methodology to compare the fees of the Plan with the fees of other similarly situated and comparable plans.

92.     **Genesco Salary Deferral Plan** ("Genesco"): The reliable estimate of $51/pp is comprised of $27/pp in direct compensation paid to Great-West from Form 5500 Schedule C and a calculation of $24/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

93.     The Genesco Plan is a meaningful benchmark because in 2018 the Genesco plan had over 2,500 participants, slightly less than the 3,278 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 2,500 participants are driven primarily by the number of participants.  There are no material differences in the RKA services provided to

plans as large as both the Genesco Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Genesco Plan and the fees paid by the Plan.

94.     Therefore, the fact that the Plan has slightly more participants than the Genesco Plan makes it a meaningful comparable plan because, all else being equal, if the Genesco Plan can obtain a fee of $51/pp with 2,695 participants, then the Plan, with 3,278 participants, should be able to obtain a fee of around $51/pp, *or lower*.

95.     **IBERIABANK Corporation Retirement Savings Plan** ("IBERIABANK"):  The reliable estimate of $40/pp is comprised of $34/pp in direct compensation paid to Prudential from Form 5500 Schedule C and a calculation of $6/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

96.     The IBERIABANK Plan is a meaningful benchmark because in 2018 it had 3,193 participants, virtually identical to the 3,278 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 2,500 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the IBERIABANK plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the IBERIABANK plan and the fees paid by the Plan.

97.     Therefore, all else being equal, if the IBERIABANK plan can obtain a fee of $40/pp with 3,193 participants, then the Plan, with 3,278 participants, should be able to obtain a fee of around $40/pp. The fact that the IBERIABANK plan had virtually the identical number of participants in 2018 as the Plan, among other reasons, makes the IBERIABANK plan a meaningfully, comparable plan.

98.     **Associated Materials, LLC 401(K) Retirement Plan** ("Associated"):  The reliable estimate of $49/pp is comprised of $49/pp in direct compensation paid to ADP from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the Associated Plan appear to contain revenue sharing.

99.     The Associated plan is a meaningful benchmark because in 2018 it had 3,639 participants, virtually identical to the 3,278 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 2,500 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Associated plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Associated plan and the fees paid by the Plan.

100.     Therefore, all else being equal, if the Associated Plan can obtain a fee of $49/pp with 3,639 participants, then the Plan, with 3,278 participants, should be able to obtain a fee of around $49/pp. The fact that the Associated Plan had virtually the identical number of participants in 2018 as the Plan, among other reasons, makes the Associated Plan a meaningful comparable plan.

101.     **The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund** ("Boston Consulting"):  The reliable estimate of $43/pp is comprised of $43/pp in direct compensation paid to Vanguard from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the Boston Consulting Plan appear to contain revenue sharing.

102. The Boston Consulting Plan is a meaningful benchmark because in 2018 it had 4,369 participants, which is slightly more than the 3,278 participants in the Plan and provides a data point that enables the calculation of a trendline that is used to generate a reliable estimate of the reasonable market rate for RKA services across a range of participants and which declines as a plan gains more participants. The costs to a recordkeeper for providing RKA services to a plan with more than around 2,500 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Boston Consulting plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Boston Consulting plan and the fees actually paid by the Plan.

103. Plaintiffs do not contend the Plan should have necessarily been able to obtain a fee as low as the Boston Consulting Plan. Rather, as noted above, the Boston Consulting Plan Total RKA fee provides a data point that enables the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of between around 2,500 and 4,500 participants. The massive disparity between the reliable estimate of the reasonable market Total RKA fee rate for RKA services for the Plan (based on having 3,278 participants) of around $47/pp and the Plan's actual Total RKA fee rate of around $197/pp leads to a reasonable inference that the Plan's process was not prudent.

104. Viewing all the data points provided by the comparable plans set forth above holistically and in the full context of how the retirement plan industry operates supports a reasonable inference that the Plan paid unreasonable and excessive fees for RKA services.

105. The market for RKA services is not transparent. Recordkeepers do not provide transparency related to the fees they charge all their clients, nor do they provide transparency related to the bids they provided throughout the Class Period for other plans with a similar number of participants as the Plan.

106.     Recordkeepers are able to negotiate at arm's length with plan fiduciaries and will happily accept higher fees from plan fiduciaries who are unaware of the reasonable market rate through, for example, failing to solicit competitive bids, among other reasons.

107.     Due to the lack of transparency, the primary and most significant driver of the disparity between the actual RKA fees paid by plans with similar numbers of participants greater than around 2,000 is the actual practices of the plans' fiduciaries.

108.     Therefore, the most plausible explanation of the disparity of between $145/pp and $157/pp from the comparable plans and the Plan (an excess of between 283% and 362%) is that the Plan's fiduciaries engaged in imprudent conduct.

109.     The disparity between the fee rates of the comparable plans based on the amount of participants in each of the plans and the reliable estimate based on the trend line created by the comparable plans fee rates is less than $10 per participant or less and are most plausibly explained by minor variations in negotiation tactics and circumstances among the fiduciaries of the comparable plans and the various recordkeepers.

| | Genesco | IBERIABANK | Associated | Boston Consulting |
|---|---|---|---|---|
| | Transamerica | Prudential | ADP | Vanguard |
| Participants (#) | 2,695 | 3,193 | 3,639 | 4,369 |
| Assets ($) | $152,254,940 | $150,049,361 | $102,486,206 | $421,208,989 |
| Direct Compensation (Schedule C) ($) | $73,729 | $109,719 | $179,475 | $185,805 |
| Indirect Compensation (Rev Share) ($) | $64,478 | $18,004 | $0 | $0 |
| Administrative Credit to Plan ($) | $0 | $0 | $0 | $0 |
| **Annual RK&A Fees ($)** | **$138,207** | **$127,723** | **$179,475** | **$185,805** |
| Annual RK&A Fees ($/pp) | $51 | $40 | $49 | $43 |

110.     The comparator plans serviced by other recordkeepers and who charged less received materially the same level and quality of Total RKA services given that these services are fungible and commodified for massive Plan like the Maersk Plan. Indeed, each of these Plans note in their fee disclosures and other Plan documents that they received RKA services materially similar to the Maersk Plan in the form of recordkeeping, trustee, accounting, and other administrative fees.

111.     Although some of the comparator utilize different service or compensation codes for the services received on the 5500 Form, the fact remains the Total RKA fees are fungible and commoditized and any differences between the plans in these codes are immaterial from a pricing perspective.

112.     The graph below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes, receiving a materially similar level and quality of RKA services in 2018, compared to the 2018 Total RKA fees paid by the Maersk Plan, with the white data points representing Total RKA fees that recordkeepers offered to (and were accepted by) comparable plans.



113.     The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several recordkeepers, including John Hancock itself, serving the market for similarly-sized plans would be willing to accept in a competitive environment to provide Total RKA services to the Maersk Plan.

114.     The table and graph above illustrate that the Plan paid a Total RKA fee of $190 per participant for 2018.

115. A reasonable Total RKA fee for the Maersk Plan based on the services provided by existing recordkeepers and the Plan's commodified and fungible services based on graph and charts above would have been $47 per participant.

116. The Total RKA fees paid by the Plan to John Hancock during the Class Period were excessive relative to the RKA services rendered given the commoditized and fungible nature of RKA fees for massive plans like the Maersk Plan.

117. More specifically, from 2017 to 2021, an unreasonable disparity of $143 per participant (over 305% premium) existed.

118. From the years 2017 through 2021 and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, had Defendant Pension Committee been acting prudently, the Plan actually would have paid significantly less than an average of approximately $664,293 per year in Total RKA fees, which equated to an effective average of approximately $190 per participant per year.

119. A hypothetical prudent plan fiduciary would not agree to pay *a 305% premium* for what they could otherwise pay for the materially similar level and quality of Total RKA services.

120. From the years 2017 through 2021, and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, the Plan additionally cost its participants on average approximately $500,075 per year in additional Total RKA fees, which equates to on average approximately $143 per participant per year.

121. From the years 2017 to 2021, and because Defendant Pension Committee did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $2,500,376 in unreasonable and excessive Total RK&A fees.

122. From the years 2017 to 2021, based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, because Defendant Pension Committee did not act prudently, and as compared to other Plans of similar sizes and with a materially similar level and quality of services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $3,283,268 in Total RKA fees.

123. Defendant Pension Committee failed to take advantage of the Plan's mammoth size to timely negotiate lower fees from its existing recordkeeper, John Hancock.

124. Defendant Pension Committee could have obtained materially similar Total RKA services for much less from other recordkeepers or from John Hancock itself had it only leveraged its massive size.

125. It can be plausibly inferred from the unreasonably high fees it paid for Total RKA services during the Class Period that Defendant Pension Committee did not conduct an effective or competitive solicitation of bids for Total RKA services, and failed to use the Plan's massive size to negotiate rebates from John Hancock.

126. Defendant Pension Committee violated its duty of prudence and loyalty by unreasonably having Non-Active participants (terminated participants) subsidize the costs of administration for the Active participants and pay additional unreasonable Total RKA fees.

127. By charging Non-Active participants unreasonably high Total RKA fees, Defendant Pension Committee impaired their continued plan participation, in violation of their fiduciary duties of prudence and loyalty under ERISA to Non-Active participants.

128. Plaintiff and Class Members paid all of these excessive and discriminatory Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

129. Defendant Pension Committee should have removed John Hancock as Plan record-keeper during the Class Period. Instead, it kept John Hancock at these inflated Total RKA fee prices for over eight years.

130. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total RKA fees than they should have been and/or by failing to take effective remedial actions including removing John Hancock as the Plan record-keeper, Defendant Pension Committee breached its fiduciary duty of prudence to Plaintiff and to other Plan participants, causing millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

131. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

132. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the Maersk Inc. Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning September 22, 2017, and running through the date of judgment.

133. The Class includes approximately 4,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

134. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a.  Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.  Whether Defendants breached their fiduciary duties of prudence and loyalty to the Plan;

c.  What are the losses to the Plan resulting from each breach of fiduciary duty; and

d.  What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

135.   Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

136.   Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

137.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

138. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

139. Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

140. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and does not involve mismanagement of individual accounts.

141. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

142. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

143. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence and Loyalty Under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against**
**Defendant Pension Committee – Total RKA Fees)**

144. Plaintiff restates the above allegations as if fully set forth herein.

145.     Defendant Pension Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

146.     29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Pension Committee in its administration of the Plan.

147.     Defendant Pension Committee, as a fiduciary of the Plan, is responsible for selecting a recordkeeper that charges reasonable and non-discriminatory Total RKA fees.

148.     During the Class Period, Defendant Pension Committee had a fiduciary duty to do all of the following: ensure that the Plan's Total RKA fees were reasonable and non-discriminatory; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

149.     During the Class Period, Defendant Pension Committee breached its fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's Total RKA fees were reasonable and non-discriminatory, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

150.     During the Class Period, Defendant Pension Committee further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, John Hancock, to make sure it was providing the Total RKA services at reasonable and non-discriminatory costs, given the highly competitive, commodified and fungible market surrounding recordkeeping and the enormous bargaining power the Plan had to negotiate the best fees, and remove John Hancock if it provided RKA services at objectively unreasonable levels.

151.     During the Class Period, Defendant Pension Committee breached its duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

152.     Defendant Pension Committee failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

153.     Defendant Pension Committee, with regard to Non-Active Participants, failed to discharge its duties with respect to the Plan for the exclusive purpose of providing benefits to participants and their beneficiaries, breaching its duties under 29 U.S.C. § 1104(a)(1)(A).

154.     Defendant Pension Committee, with regard to Non-Active Participants, violated their duties of loyalty and prudence by charging them unreasonable fee and by having them subsidize the cost of administration for Active Participants.

155.     As a result of Defendant Pension Committee's breach of fiduciary duties of prudence and loyalty with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

156.     Defendant Pension Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Maersk Plan the losses resulting from the breaches, to restore to the Plan any profits Defendant Pension Committee made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Pension Committee is subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other**
**Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against**
**Defendants Maersk and Board – Total RKA Fees)**

157.     Plaintiff restates the above allegations as if fully set forth herein.

158.    Defendants Maersk and Board had the authority to appoint and remove members or individuals responsible for Plan Total RKA fees on the Pension Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

159.    In light of this authority, Defendants Maersk and Board had a duty to monitor those individuals responsible for Plan Total RKA fees on the Pension Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

160.    Defendants Maersk and Board had a duty to ensure that the individuals on the Pension Committee responsible for Plan Total RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Total RKA fees; and reported regularly to Defendant Maersk and Board.

161.    The unreasonable and discriminatory Total RKA fees paid by the Plan inferentially establish that Defendants Maersk and Board breached their duty to monitor by, among other things:

   a.    Failing to monitor and evaluate the performance of individuals responsible for Plan Total RKA fees on the Pension Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonable and discriminatory Total RKA expenses;

   b.    Failing to monitor the process by which the Plan's recordkeeper, John Hancock, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

   c.    Failing to remove individuals responsible for Plan Total RKA fees on the Pension Committee whose performance was inadequate in that these individuals continued to pay the same Total RKA fees over numerous years even though solicitation of competitive bids would have shown that maintaining John Hancock as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiff's and other Plan participants' retirement savings.

162. As the consequences of the breaches of the duty to monitor for Total RKA fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and discriminatory monetary losses.

163. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Maersk and Board are liable to restore to the Maersk Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Total RKA fees on the Pension Committee. In addition, Plaintiff and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable and discriminatory Total RKA fees, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An Order requiring Maersk to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Maersk as necessary to effectuate relief, and to prevent Maersk's unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: September 22, 2023

**FITZGERALD HANNA & SULLIVAN, PLLC**

/s/_____

Andrew L. Fitzgerald
119 Brookstown Avenue, Suite 402
Winston-Salem, NC 27101
Telephone: 336-793-4365
Fax: 336-793-4696
E-Mail: andy@fitzgeraldlitigation.com

**WALCHESKE & LUZI, LLC**

Paul M. Secunda*
*Pro Hac Vice Motion Pending*
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
Fax: (262) 565-6469
psecunda@walcheskeluzi.com

*Attorneys for Plaintiff and Proposed Class*