# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

CHARLENE P. LEON, individually, and as a representative of a Class of Participants and Beneficiaries of the Maersk Inc. Pension,

       Plaintiff,

    v.

MAERSK INC, THE BOARD OF DIRECTORS OF MAERSK INC., and THE PENSION COMMITTEE OF MAERSK INC.,

       Defendants.

CASE NO. 3:23-CV-00602-RJC-SCR

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    I.     The Plan ........................................................................................................ 3

    II.    The Plan's RKA Services and Fees ............................................................. 4

    III.   Plaintiff's Severance Agreement ................................................................. 7

    IV.   Plaintiff's Claims ......................................................................................... 7

LEGAL STANDARD .......................................................................................................... 7

ARGUMENT ...................................................................................................................... 9

    I.     The Complaint Should Be Dismissed Because Plaintiff Released Her Right to Assert Any ERISA Claim or Participate in Any ERISA Class Action ........................................................................................................... 9

    II.    Plaintiff's Excessive-Fee and Fee-Discrimination Allegations Do Not State a Viable Claim for Breach of Fiduciary Duty Under ERISA. .................... 10

        A.    Plaintiff's Excess-Fee Allegations Fail to State a Claim. ......................... 11

            1.    Plaintiff Overstates the Plan's Recordkeeping Fees. ................... 12

            2.    Plaintiff's Four Comparators Are Not Meaningful Benchmarks. ................................................................................. 13

            3.    Plaintiff's Fee Comparisons Are Meaningless for Additional Reasons. .................................................................... 17

        B.    Plaintiff's Discriminatory-Fee-Allocation Allegations Fail .................... 21

            1.    Plaintiff Has No Standing to Challenge Fees She Never Paid. ............................................................................................. 21

            2.    The Committee Had No Duty to Ensure Fee Parity, and Regardless Plaintiff Has Not Alleged Any Resulting Losses. ........................................................................................... 22

    III.   Plaintiff's Derivative Failure-to-Monitor Claim in Count II Should Be Dismissed. ................................................................................................. 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022) ......................................................................................11, 14

*Ali v. Hogan*,
26 F.4th 587 (4th Cir. Feb. 18, 2022) ........................................................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................8

*Baehr v. Creig Northrop Team, P.C.*,
953 F.3d 244 (4th Cir. 2020) .....................................................................................7

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................8

*Christian v. Vought Aircraft Indus., Inc.*,
2010 WL 4065482 (E.D.N.C. Oct. 15, 2010)........................................................9, 10

*In re Constellation Energy Grp., Inc.*,
738 F. Supp. 2d 602 (D. Md. 2010).........................................................................25

*Cunningham v. USI Ins. Servs., LLC*,
2022 WL 889164 (S.D.N.Y. Mar. 25, 2022) ...........................................................18

*Davis v. Old Dominion Tobacco Co.*,
755 F. Supp. 2d 682 (E.D. Va. 2010) .......................................................................9

*In re Duke Energy ERISA Litig.*,
281 F. Supp. 2d 786 (W.D.N.C. 2003) ...................................................................25

*England v. DENSO Int'l Am., Inc.*,
2023 WL 4851878 (E.D. Mich. July 28, 2023) ..................................................14, 16

*Evans v. B.F. Perkins Co.*,
166 F.3d 642 (4th Cir. 1999) .....................................................................................7

*Evans v. Exel Inc.*,
2017 WL 6043960 (D.S.C. Dec. 6, 2017) .................................................................9

*In re Fidelity ERISA Fee Litig.*,
990 F.3d 50 (1st Cir. 2021)........................................................................................3

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014).................................................................................................8, 21

*Fritton v. Taylor Corp.*,
2022 WL 17584416 (D. Minn. Dec. 12, 2022)......................................................17

*Goines v. Valley Cmty. Servs. Bd.*,
822 F.3d 159 (4th Cir. 2016) ...................................................................................3

*Guyes v. Nestle USA, Inc.*,
2022 WL 18106384 (E.D. Wis. Nov. 21, 2022) ....................................................15

*Hall v. Cap. One Fin'l Corp.*,
2023 WL 2333304 (E.D. Va. Mar. 1, 2023) .......................................................8, 11

*Halldorson v. Wilmington Tr. Ret. & Institutional Servs. Co.*,
182 F. Supp. 3d 531 (E.D. Va. 2016) .......................................................................9

*Harmon v. Shell Oil Co.*,
No. 3:20-cv-0021, Dkt. 134 (S.D. Tex. Mar. 1, 2021) ..........................................16

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) .................................................................................23

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022)..........................................................................................2, 8, 13

*Hughes v. Nw. Univ.*,
63 F.4th 615 (7th Cir. 2023) ..................................................................................11

*Hutchens v. Cap. One Servs., LLC*,
2020 WL 3053657 (E.D. Va. June 8, 2020) ..........................................................10

*ING Inv. Plan Servs. v. Solberg*,
2010 WL 582347 (D. Colo. Feb. 16, 2010).............................................................3

*Kendall v. City of Chesapeake*,
174 F.3d 437 (4th Cir. 1999) ...................................................................................9

*Krutchen v. Ricoh USA, Inc.*,
2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) ......................................................15

*Laabs v. Faith Techs., Inc.*,
2022 WL 17418358 (E.D. Wis. Nov. 9, 2022) ......................................................15

*LaRue v. DeWolff, Boberg & Assoc., Inc.*,
552 U.S. 248 (2008).................................................................................................24

*Leichling v. Honeywell Int'l, Inc.*,
    842 F.3d 848 (4th Cir. 2016) ...................................................................................3

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996)..................................................................................................22

*Mateya v. Cook Grp. Inc.*,
    2023 WL 4608536 (S.D. Ind. June 16, 2023)..............................................14, 17, 18

*Matney v. Barrick Gold of N. Am.*,
    80 F.4th 1136 (10th Cir. 2023) ....................................................................11, 14, 23

*Mator v. Wesco Distrib., Inc.*,
    2022 WL 3566108 (W.D. Pa. Aug. 18, 2022) ...........................................................18

*Matousek v. MidAmerican Energy Co.*,
    51 F.4th 274 (8th Cir. 2022) .......................................................................12, 14, 20

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) ....................................................................................3

*Miller v. Packaging Corp. of Am., Inc.*,
    2023 WL 2705818 (W.D. Mich. Mar. 30, 2023).........................................15, 16, 18

*Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*,
    394 F. Supp. 2d 762 (M.D.N.C. 2005) .....................................................................22

*Nanni v. Aberdeen Marketplace, Inc.*,
    878 F.3d 447 (4th Cir. 2017) ....................................................................................8

*PBGC v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013).......................................................................................9

*Peter Marco, LLC v. Banc of Am. Merch. Servs., LLC*,
    2023 WL 2919306 (W.D.N.C. Mar. 9, 2023) ...........................................................3

*Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*,
    663 F.3d 210 (4th Cir. 2011) ...................................................................................11

*Probst v. Eli Lilly & Co.*,
    2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) ......................................................15, 16

*Roman v. Spirit Airlines, Inc.*,
    482 F. Supp. 3d 1304 (S.D. Fla. 2020) ....................................................................10

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983)....................................................................................................23

*Sigetich v. Kroger Co.*,
2023 WL 2431667 (S.D. Ohio Mar. 9, 2023)..................................................................15, 16

*Singh v. Deloitte LLP*,
650 F. Supp. 3d 259 (S.D.N.Y. 2023).................................................................................15

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) .................................................................................2, 14, 20

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................................................21

*Stanley v. George Wash. Univ.*,
801 F. App'x 792 (D.C. Cir. 2020)....................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................................................3

*Thole v. U.S. Bank N.A.*,
140 S. Ct. 1615 (2020)........................................................................................................21

*Trimble v. AT&T Mobility LLC*,
2023 WL 5493584 (W.D.N.C. Aug. 24, 2023)..................................................................10

*U.S. v. Bank of Am., N.A.*,
2012 WL 4808737 (W.D.N.C. Oct. 10, 2012).....................................................................9

*Veney v. Wyche*,
293 F.3d 726 (4th Cir. 2002) .............................................................................................13

*Wehner v. Genetech, Inc.*,
2021 WL 507599 (N.D. Cal. Feb. 9, 2021) .......................................................................18

*White v. Chevron Corp.*,
752 F. App'x 453 (9th Cir. 2018) ........................................................................................8

**Statutes**

29 U.S.C. § 1104(a)(1)(B) ........................................................................................................11

29 U.S.C. § 1109......................................................................................................................24

29 U.S.C. § 1132(a)(2)............................................................................................................24

**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6)................................................................................................. *passim*

Fed. R. Civ. P. 12(c) ..........................................................................................................................10

Case 3:23-cv-00602-RJC-SCR     Document 14     Filed 12/04/23     Page 7 of 33

**INTRODUCTION**

To help employees save for retirement, Maersk Inc. sponsors a 401(k) plan, known as the Maersk Inc. Savings Plan ("Plan"). The Plan is funded by voluntary employee contributions plus employer contributions from Maersk, the latter of which have totaled $70 million since 2017. The Plan allows participants to invest both their personal and employer contributions among a diverse range of investment options. The Complaint does not challenge the generosity of Maersk's contributions, or the appropriateness of the investment options the Plan provides. Instead, the Complaint asserts a cookie-cutter claim that has become commonplace in recent years due to a slew of similar ERISA[1] class actions filed against employers across the country by a handful of plaintiff firms: that the Plan paid too much for the "recordkeeping and administrative" services necessary to ensure the Plan's smooth and accurate functioning.[2]

The vehicle for this latest claim is a former Maersk employee who alleges she participated in the Plan and then cashed out, before terminating her Maersk employment under a severance agreement in early 2023. According to the Complaint filed in violation of that agreement, the Court should infer that the Pension Committee of Maersk Inc. ("Committee") breached its fiduciary duty to prudently monitor the Plan's recordkeeping fees, because those fees were larger than recordkeeping paid by just *four* of the thousands of other plans offered by employers across the country during a *single* year (2018). The Complaint also alleges that the way the Plan's recordkeeping fees were allocated among participants "discriminated" against former-employee participants (who paid more) in favor of active-employee participants (who paid less). Neither theory has merit, and the Complaint should be dismissed for three principal reasons.

---

[1] ERISA means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461.

[2] Plaintiff's counsel alone has filed dozens of these putative class actions since 2020.

*First*, the Complaint should be dismissed at the threshold because Plaintiff is contractually barred from prosecuting it. Since cashing out of the Plan, Plaintiff signed a severance agreement expressly waiving any right she had to assert an ERISA claim or to participate, as either a member or class representative, in an ERISA class action. The Court should enforce that clear agreement now by dismissing the Complaint.

*Second*, the Complaint's excessive-fee claim fails on plausibility grounds. Although the Fourth Circuit has not squarely addressed the issue, it is well settled in other circuits that a plaintiff cannot state a plausible breach of fiduciary duty claim under ERISA merely by comparing the alleged recordkeeping fees of one plan to those of other plans. *See, e.g.*, *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022). "Nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest" services available, and neither are all retirement plans and recordkeeping services created equal. *Id.* (citation omitted). For these reasons, the law gives plan fiduciaries considerable discretion to determine the quantity and quality of recordkeeping services they deem best for their unique retirement plans, and thus, even at the pleadings stage, "[district] courts must give due regard to the range of reasonable judgments a fiduciary may make" in selecting and pricing recordkeeping services. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). To state a claim under this framework, a plaintiff must, at minimum, plausibly allege (1) how much the plan paid for recordkeeping services, (2) as compared to a meaningful benchmark, such as other plans that paid substantially less for the *same* recordkeeping services.

The Complaint here does neither. Although it alleges that the Plan paid up to $197 per participant for annual recordkeeping services, this allegation is contradicted by the same Form 5500 and fee-disclosure documents on which the Complaint relies. It also contradicts the relevant contract, which makes clear that the Plan's annual fee for ongoing recordkeeping services was a

2

small percentage (0.0425%) of total Plan assets—equal to $62.09 per participant in 2018 and $44.75 in 2022. The Court need not accept fee allegations that are contrary to the documents on which Plaintiff's claims are based. Regardless, the Complaint also flunks the "meaningful benchmark" requirement because it fails to plausibly allege that the four "comparator" plans it identifies paid substantially less for the *same* recordkeeping services as the Maersk Plan.

*Third*, Plaintiff's fee "discrimination" theory is equally groundless. For one thing, Plaintiff never paid the allegedly "discriminatory" fees, so she has no Article III standing to challenge them. For another, nothing in ERISA requires fiduciaries to ensure plan fees are proportionately allocated among all participants, nor has Plaintiff identified any losses resulting from the allocation method utilized here. Plaintiff's fee-discrimination theory should therefore be dismissed on jurisdictional grounds under Rule 12(b)(1), and plausibility grounds under Rule 12(b)(6).

For these essential reasons, the Court should dismiss the Complaint with prejudice.

## BACKGROUND[3]

### I. The Plan

The Plan is a defined-contribution plan under ERISA. Compl. ¶¶ 2, 5. Maersk sponsors

---

[3] This summary comes from Plaintiff's allegations and public documents referenced in, or integral to, the Complaint. In assessing claims under Rule 12(b)(6), the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). In ERISA cases like this one, courts therefore commonly consider the plan or plan-related documents, the plan's statutorily required fee disclosures, and the plan's annual Form 5500 filings at the pleadings stage. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822-23 (8th Cir. 2018). Finally, the Court may also consider the fee agreement between the Maersk and the Plan's recordkeeper (John Hancock) because it is "integral to the complaint and authentic." *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 851 (4th Cir. 2016) (citation omitted); *Goines*, 822 F.3d at 164, 166 (same); *Peter Marco, LLC v. Banc of Am. Merch. Servs., LLC*, 2023 WL 2919306, at *4 (W.D.N.C. Mar. 9, 2023) (considering contract attached to motion to dismiss that was "integral to the complaint and authentic") (citation omitted). That contract is integral to the claims here because it sets the fees that are at issue in the Complaint, and there can be no dispute about the contract's authenticity. In these circumstances, courts commonly consider recordkeeping contracts at the pleadings stage. *See, e.g.*, *In re Fidelity ERISA Fee Litig.*, 990 F.3d 50, 53-54 (1st Cir. 2021); *ING Inv. Plan Servs. v. Solberg*, 2010 WL 582347, at *1 n.2 (D. Colo. Feb. 16, 2010).

the Plan and appoints the Pension Committee (the "Committee") members who manage it. *Id.* ¶¶ 3-7, 34-35. The Plan offers a diverse menu of investment options, which allows participants to choose for themselves how to invest and save for retirement on a tax-deferred basis. *Id.* ¶¶ 1-5; Ex. 1, Disclosure Document (Sept. 30, 2021) at 2-6. The money participants invest in the Plan comes from their own voluntary contributions, as well as employer contributions from Maersk.[4] Since 2017, Maersk has made approximately $70 million in employer contributions to the Plan.[5] On December 31, 2021, the Plan had 4,099 participants with account balances and approximately $766 million in total assets. Compl. ¶¶ 36-37.

## II. The Plan's RKA Services and Fees

The Plan engages John Hancock to provide certain recordkeeping and administrative services to the Plan, which we refer to herein as "recordkeeping" services. Compl. ¶¶ 3, 39. As a DOL article cited in the Complaint explains, recordkeeping services include (1) services necessary to the daily operation of the plan, such as "recordkeeping, accounting, legal and trustee services," and (2) "a host of additional services, such as telephone voice response systems, access to customer service representative[s], educational seminars, retirement planning software, investment advice, electronic access to plan information, daily valuation, and online transactions," among others.[6]

The Complaint describes three types of recordkeeping services. The first and largest

---

[4] *See, e.g.*, Ex. 2, Excerpts from Maersk Inc. Savings Plan 2017 Form 5500, Fin. Stmts. at 5 (describing participant elective contributions, company contributions, and additional Maersk contributions).

[5] *See* Ex. 2, Excerpts from Maersk Inc. Savings Plan 2017 Form 5500, Fin. Stmts. at 4 (employer contributions of $11.41 million); Ex. 3, Excerpts from Maersk Inc. Savings Plan 2018 Form 5500, Fin. Stmts. at 4 ($11.27 million); Ex. 4, Excerpts from Maersk Inc. Savings Plan 2019 Form 5500, Fin. Stmts. at 4 ($11.27 million); Ex. 5, Excerpts from Maersk Inc. Savings Plan 2020 Form 5500, Fin. Stmts. at 4 ($11.44 million); Ex. 6, Excerpts from Maersk Inc. Savings Plan 2021 Form 5500, Fin. Stmts. at 6 ($11.96 million); Ex. 7, 2022 Form 5500, Fin. Stmts. at 6 ($12.61 million).

[6] *See* Compl. ¶ 74 (citing DOL, Understanding Retirement Plan Fees and Expenses at 2 (Sept. 2021), available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Dec. 4, 2023)).

category is "bundled" services, including recordkeeping, transaction processing, administrative services, participant communications, tracking account balances, overseeing investment elections, processing transactions, and customer service support. Compl. ¶¶ 40-43. The second category is "a la carte" services that individual participants may elect for a fee, including loan processing, brokerage services, benefit-distribution services, and qualified-domestic-relations-order services. *Id.* ¶¶ 59-60. The third category is "ad hoc" services, "including such things as ESOP fees, fees for service, and terminated maintenance fees." *Id.* ¶¶ 61-62.

The Plan's recordkeeping fees and services are well documented. Under its contract with John Hancock, the Plan paid an annual fee of 0.0425% of Plan assets for plan-wide recordkeeping services. Ex. 8, John Hancock Plan Services, LLC Fee Schedule (Jan. 1, 2017) ("Fee Agreement") at 2, 4-5 (listing 0.0425% fee and list of "Ongoing Services" that fee covered). This asset-based fee was the equivalent of approximately $62.09 per participant in 2018 and $44.75 per participant in 2022.[7] The contract also specified additional fees participants pay directly for "a la carte" services, *id.* at 2 (e.g., $50 fee for loans), and separate fees the Plan or Maersk would pay for "optional" (or "ad hoc") services, *id.* at 6-7.

The amounts participants were charged for recordkeeping services were disclosed in the annual "Disclosure Documents," referenced in the Complaint. *See, e.g.*, Compl. ¶¶ 44, 48, 60, 62, 88; Ex. 9, Disclosure Document (Sept. 30, 2018). The Disclosure Documents listed the fees

---

[7] These amounts are calculated by multiplying the 0.0425% fee times the Plan's total investment assets as of December 31, 2018 and December 31, 2022, as reported in the Plan's Form 5500 in each year, and then dividing the result by the total number of participants with an account balance, as reported in the same Forms 5500. *See* Ex. 3, Excerpts from Maersk Inc. Savings Plan 2018 Form 5500 at Part II § 6(g) (3,278 participants with balances in 2018) & Fin. Stmts. at 3 (total investment assets of $478,691,464 in 2018); Ex. 7, Excerpts from Maersk Inc. Savings Plan 2022 Form 5500 at Part II § 6(g) (6,161 participants in 2022) & Fin. Stmts. at 5 (total investment assets of $648,682,243 in 2022). Thus, in 2018: (0.000425 x $478,691,464) / 3,278 participants = **$62.09** per participant. And, in 2022: (0.000424 x $646,682,243) / 6,161 participants = **$44.75** per participant.

participants would be charged for "a la carte" services, like loans ($50) or hardship withdrawals ($75). *Id.* at 6. The Disclosure Documents also listed the maximum amount participants would pay for all other services the Plan received, including for John Hancock's recordkeeping services and other services provided by other services providers. *See id.* at 6-7 ("The plan may pay service providers for administrative services . . . such as recordkeeping and investment advisory services."); Ex. 3, Excerpts from Maersk Inc. Savings Plan 2018 Form 5500, Sched. C, Part I § 2 (listing service providers). Thus, an active-employee participant with a balance of less than $5,000 would be charged $0.00 for recordkeeping and other Plan services, while active-employee participants with larger account balances would be charged $31.50 (balance of $5,001-$79,999), $78.75 ($80,000-$299,999), or $236.50 ($300,000 or more). *Id.* ¶ 48; Ex. 9, Disclosure Document (Sept. 30, 2018) at 6-7.

The average participant account balance in 2017-2022 was as follows: $164,017 (2017), $146,031 (2018), $163,531 (2019), $183,853 (2020), $184,376 (2021), and $104,963 (2022).[8] Thus, on average, active-employee participants were charged $78.75 for recordkeeping and other non-recordkeeping services, while former-employee participants were charged an average of $112.50 for those same recordkeeping and non-recordkeeping services. *See* Compl. ¶ 48; Ex. 9, Disclosure Document (Sept. 30, 2018) at 6-7. These amounts were separate from any fees participants incurred for optional "a la carte" and "ad hoc" services, described above.

---

[8] The Plan's average participant account balance each year is determined by dividing total invested assets by the total number of participants with account balances, as reported in the same Form 5500 filings on which the Complaint bases its "excessive fee" allegations. *See* Ex. 2, Excerpts from Maersk Savings Plan 2017 Form 5500 at Part II § 6(g), and Fin. Stmts. at 3; Ex. 3, Excerpts from Maersk Savings Plan 2018 Form 5500 at Part II § 6(g), and Fin. Stmts. at 3; Ex. 4, Excerpts from Maersk Savings Plan 2019 Form 5500 at Part II § 6(g), and Fin. Stmts. at 3; Ex. 5, Excerpts from Maersk Savings Plan 2020 Form 5500 at Part II § 6(g), and Fin. Stmts. at 3; Ex. 6, Excerpts from Maersk Savings Plan 2021 Form 5500 at Part II § 6(g), and Fin. Stmts. at 5; Ex. 7, 2022 Form 5500 at Part II § 6(g), and Fin. Stmts. at 5.

### III. Plaintiff's Severance Agreement

Plaintiff alleges that she "rolled out" of the Plan in 2021. Compl. ¶ 24. Thereafter, in February 2023, Plaintiff's employment with Maersk came to an end. Compl. ¶ 27; Ex. 10, Separation Agreement. Under the terms of her severance agreement, Plaintiff agreed to release her rights to: (1) assert "any claims arising out of or relating in any way to" ERISA; (2) "bring or litigate a lawsuit regarding any such [ERISA] claim as a class or collective action"; and (3) "act as a class representative or to participate as a member of a class of claimants with respect to any lawsuit regarding any such [ERISA] claim." Ex. 10, Separation Agreement, ¶¶ 2(a), 3, 16.

### IV. Plaintiff's Claims

The Complaint contains two Counts. In Count I, Plaintiff claims the Committee breached its fiduciary duty of prudence by allowing the Plan to incur unreasonable recordkeeping fees, and breached its fiduciary duties of prudence and loyalty by allowing former-employee participants to pay a larger proportionate share of recordkeeping fees (relative to their Plan account balances) than active-employee participants with similar account balances. *See* Compl. ¶¶ 144-56. In Count II, Plaintiff claims Maersk and its Board of Directors failed to prudently monitor the Committee and, thus, contributed to the Committee's alleged breaches in Count I. *Id.* ¶¶ 157-63.

### LEGAL STANDARD[9]

In assessing ERISA breach of fiduciary duty claims under Rule 12(b)(6), courts must apply

---

[9] This section describes the Rule 12(b)(6) pleading standard. Defendants also move to dismiss Plaintiff's fee-discrimination claim on Article III standing grounds under Rule 12(b)(1). "Article III standing is part and parcel of the constitutional mandate that the judicial power of the United States extend only to 'cases and 'controversies.'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (citation omitted). "That constitutional mandate … requires a party invoking a federal court's jurisdiction to demonstrate standing." *Id.* (internal quotations and citations omitted); *see also Ali v. Hogan*, 26 F.4th 587, 595-96 (4th Cir. Feb. 18, 2022) ("The plaintiff bears the burden of establishing standing to sue as of the time he commenced the litigation."). In considering a jurisdictional challenge under Rule 12(b)(1), including on Article III standing grounds, "the district court … may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted).

the pleading standards described in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), evaluating a complaint's allegations "as a whole" and "giv[ing] due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S. at 177. "Because the content of the duty of prudence turns on the circumstances . . . prevailing at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Hall v. Cap. One Fin'l Corp.*, 2023 WL 2333304, at *4 (E.D. Va. Mar. 1, 2023), *appeal dismissed*, 2023 WL 6388629 (4th Cir. May 12, 2023) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)).

Under this analysis, when there are "two possible explanations, only one of which can be true and only one of which results in liability, [a] plaintiff [] cannot offer allegations that are 'merely consistent with' [its] favored explanation but are also consistent with [an] alternative explanation." *White v. Chevron Corp.*, 752 F. App'x 453, 454 (9th Cir. 2018) (citation omitted); *see also Iqbal*, 556 U.S. at 678-79, 682 ("[A] complaint [that] pleads facts that are 'merely consistent with' a defendant's liability" fails to state a claim) (citation omitted). Ultimately, the Court must "draw[] on judicial experience and common sense" to determine whether "more than the mere possibility" of misconduct can be inferred from the specific facts alleged. *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (cleaned up) (citation omitted).

The Supreme Court has emphasized that Rule 12(b)(6) is an "important mechanism for weeding out meritless [ERISA] claims." *Dudenhoeffer*, 573 U.S. at 425. This is due to the "range of reasonable judgments a fiduciary may make" in carrying out her duties, *Hughes*, 595 U.S. at 177, and because "the prospect of discovery" in ERISA class actions is "ominous" and "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the

settlement value." *PBGC v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718-19 (2d Cir. 2013) (citation omitted).

**ARGUMENT**

**I.      The Complaint Should Be Dismissed Because Plaintiff Released Her Right to Assert Any ERISA Claim or Participate in Any ERISA Class Action.**

The Complaint should be dismissed, at the threshold, because it is barred by the Separation Agreement Plaintiff signed in February 2023. This Court follows "the general principle that settlements are to be encouraged." *U.S. v. Bank of Am., N.A.*, 2012 WL 4808737, at *2 (W.D.N.C. Oct. 10, 2012) (citation omitted). To that end, "federal courts generally enforce releases of federally protected rights in the employment context if the release was knowing and voluntary." *Davis v. Old Dominion Tobacco Co.*, 755 F. Supp. 2d 682, 692 (E.D. Va. 2010) (citing *Kendall v. City of Chesapeake*, 174 F.3d 437, 441 n.2 (4th Cir. 1999)).

ERISA claims are no exception. Courts within the Fourth Circuit have repeatedly held that a plan participant may release breach of fiduciary duty claims under ERISA. *See, e.g.*, *Christian v. Vought Aircraft Indus., Inc.*, 2010 WL 4065482, at *6 (E.D.N.C. Oct. 15, 2010) ("[A] broad release of claims related to an employment relationship is effective to release an ERISA claim."), *aff'd*, 439 F. App'x 272 (4th Cir. 2011); *Evans v. Exel Inc.*, 2017 WL 6043960, at *2 (D.S.C. Dec. 6, 2017), *aff'd*, 719 F. App'x 299 (4th Cir. 2018) ("[P]arties may voluntarily release ERISA claims."); *Halldorson v. Wilmington Tr. Ret. & Institutional Servs. Co.*, 182 F. Supp. 3d 531, 542 (E.D. Va. 2016) (dismissing plaintiff's ERISA fiduciary-breach claim where plaintiff's claim was "encompassed by his [r]elease").

Likewise, here, Plaintiff's Separation Agreement bars her claims. Apart from being a complete and general release, the Separation Agreement expressly covers any "claim or right based upon or arising under . . . [ERISA.]" Ex. 10, Separation Agreement ¶ 3(a). Because Plaintiff's

9

claims fall squarely within the scope of these provisions, she is barred from bringing this action. *See, e.g.*, *Christian*, 2010 WL 4065482, at *6; *Stanley v. George Wash. Univ.*, 801 F. App'x 792, 793 (D.C. Cir. 2020) (affirming Rule 12(b)(6) dismissal of similar ERISA fiduciary breach claims, alleging excessive recordkeeping fees).

Even apart from her release, Plaintiff agreed to refrain from participating in any ERISA class action against Maersk. *See supra* at 7; Ex. 10, Separation Agreement ¶ 16. This provides yet another reason for enforcing the Separation Agreement now to bar Plaintiff from pursuing litigation that clearly violates it. *See, e.g.*, *Hutchens v. Cap. One Servs.*, *LLC*, 2020 WL 3053657, at *18 (E.D. Va. June 8, 2020) (granting Rule 12(c) motion because plaintiff waived right "bring or participate in a collective action"); *Trimble v. AT&T Mobility LLC*, 2023 WL 5493584, at *3 (W.D.N.C. Aug. 24, 2023) (enforcing class-action waiver in an arbitration agreement to preclude plaintiff from pursuing individual or class litigation in court); *Roman v. Spirit Airlines, Inc.*, 482 F. Supp. 3d 1304, 1315 (S.D. Fla. 2020), *aff'd*, 2021 WL 4317318 (11th Cir. Sept. 23, 2021) ("Indeed, various courts have held that the enforceability of a class action waiver should be resolved by way of a motion to dismiss and before discovery begins.").

## II. Plaintiff's Excessive-Fee and Fee-Discrimination Allegations Do Not State a Viable Claim for Breach of Fiduciary Duty Under ERISA.

In Count I, Plaintiff claims the Committee breached its fiduciary duties in two ways. First, Plaintiff alleges the Committee allowed the Plan to incur "excessive" total recordkeeping fees relative to four "comparator" plans, supporting an inference that the Committee failed to prudently monitor the Plan's fees. Second, Plaintiff alleges the Committee allowed "discrimination" against former-employee participants because they were charged a larger proportion of the Plan's recordkeeping fees than active-employee participants with similar account balances, in violation of the Committee's duty of prudence and loyalty. Neither theory withstands scrutiny.

10

### A. Plaintiff's Excess-Fee Allegations Fail to State a Claim.

To state a viable "imprudence" claim under ERISA, Plaintiff must allege facts plausibly showing that the Committee failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person would use when monitoring plan recordkeeping fees. 29 U.S.C. § 1104(a)(1)(B). The prudence requirement is "an objective standard, focusing on a fiduciary's conduct in arriving at [challenged] decision, *not on its results*." *Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 216 (4th Cir. 2011) (emphases added) (citation omitted). A plaintiff "must allege either direct facts demonstrating a deficient fiduciary process or circumstantial facts allowing a plausible inference that the [fiduciary's] decision[making] was outside the 'range of reasonable judgments a fiduciary may make based on [its] experience and expertise." *Hall*, 2023 WL 2333304, at *4 (quoting *Hughes*, 142 S. Ct. at 742). Under the latter approach, the well-pled factual "allegations must give rise to a *reasonable* inference that the defendant committed the alleged misconduct, thus allowing the court to infer more than the *mere possibility* of misconduct." *Id.* (cleaned up) (citation omitted).

Plaintiff attempts that latter approach here.[10] Specifically, the Complaint alleges that the Court should infer the Committee failed to prudently monitor Plan recordkeeping fees because: (1) those fees supposedly approached $190 per participant annually, which is (2) more than the amounts allegedly paid by four other plans in 2018 only. *See* Compl. ¶¶ 88-89. Neither of these allegations supports a plausible inference of fiduciary imprudence, as shown below.

---

[10] The only allegation related to the Committee's process is Plaintiff's speculation that it may not have involved an RFP to select the Plan's recordkeeper. However, it is well settled that failure to conduct an RFP is insufficient to support a plausible claim that fiduciaries failed to prudently monitor recordkeeping fees. *See, e.g.*, *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1156 (10th Cir. 2023); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579 (7th Cir. 2022), *reh'g denied*, 2022 WL 4372363 (7th Cir. Sep. 21, 2022); *Hughes v. Nw. Univ.*, 63 F.4th 615, 632 (7th Cir. 2023).

### 1. Plaintiff Overstates the Plan's Recordkeeping Fees.

According to the Complaint, the Plan has paid, on average, $190 per participant to John Hancock for recordkeeping services since 2017. Compl. ¶ 88. Plaintiff bases these allegations on a single datapoint in the Plan's annual Form 5500 documents, which report the total of any "direct fee" the Plan or a participant paid for John Hancock services at any time during the Plan year, without further explanation of how those fees relate, offset, or are otherwise incurred or applied under the relevant contract. *See* Compl. ¶ 88-89; Ex. 3, Excerpts from Maersk Inc. Savings Plan 2018 Form 5500, Sched. C, Part I § 2. This approach does not plausibly support the Complaint's Plan fee estimates for several reasons.

*First*, Plaintiff ignores that the "direct fee" amounts she pulls from the Forms 5500 are attributed to four different service codes (Codes 15, 37, 62, 64), only one of which (Code 64) is "recordkeeping fees." This means the "direct fee" amounts on which Plaintiff relies pertain to various other services—not necessarily recordkeeping. For this same reason, courts have repeatedly recognized that Forms 5500 often provide little insight on the specific amounts a plan paid for relevant recordkeeping services. *See, e.g.*, *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) (affirming dismissal of excessive recordkeeping fee claims, in part, because the Forms 5500 on which plaintiff had based allegation that plan paid more than $100 per-participant in recordkeeping fees "cover more than just standard recordkeeping services").

*Second*, Plaintiff ignores other information in the Forms 5500 and the annual Disclosure Documents referenced in the Complaint that contradict her fee estimates. Specifically, the Disclosure Documents quoted in the Complaint show that active-employee participants with less than $300,000 in their Plan accounts paid either $0.00, $31.50, or $78.75 in fees for recordkeeping and other *non-recordkeeping* services the Plan received. *See supra* at 5-6. Meanwhile, the Forms 5500 the Complaint relies upon confirm that the Plan's average participant balance was far *lower*

12

than $300,000—meaning that, apart from any "a la carte" services, the average active-employee participant was paying *no more than* $78.75 per year for *both* recordkeeping and other *non-recordkeeping* services the Plan received. *See supra* at 5-6. These facts arising from Plaintiff's own source documents render implausible her contradictory allegation that the Plan's recordkeeping fees ranged from $183 to $197 per participant. *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (courts need not accept allegations that are contradicted by matters properly subject to judicial notice or by exhibit).

***Third***, the Plan's contract with John Hancock further demonstrates that Plaintiff's annual fee estimates are implausible. That document confirms the Plan agreed to pay John Hancock 0.0425% of Plan assets for nearly all recordkeeping services. *See supra* at 5. This implies an average per-participant cost of about $62 in 2018 and $44 in 2022, consistent with the other documents Plaintiff cites (above) showing that active-employee participants paid no more than $78.75 on average for both recordkeeping *and non-recordkeeping* services.

In short, the same Forms 5500 and Disclosure Documents on which the Complaint's allegations are based—and the contractual fee agreement that is integral to its claims—foreclose the plausibility of Plaintiff's allegations about how much the Plan paid for recordkeeping services since 2017. Plaintiff's excessive-fee claim thus falters out of the gate.

### 2. Plaintiff's Four Comparators Are Not Meaningful Benchmarks.

Even assuming Plaintiff's fee estimates were plausibly alleged, her claim would still fail because she has not alleged facts to support an inference that those estimated amounts fell outside the "range of reasonable" fees the Plan could pay for the specific recordkeeping services John Hancock provided. *Hughes*, 595 U.S. at 177.

Plaintiff tries to make this showing by comparing the Plan's alleged fees to the amounts she estimates four other plans paid in 2018. Compl. ¶ 89. But such naked price comparisons are

generally insufficient to support a plausible inference of imprudence. Over just the past two years, the Sixth, Seventh, Eighth, and Tenth Circuits have all held that a plaintiff cannot state a plausible ERISA claim by simply comparing a plan's recordkeeping fees to those paid by other plans. *See, e.g.*, *CommonSpirit*, 37 F.4th at 1169 (affirming dismissal because price-disparity allegations were insufficient to support plausible inference of imprudent fee monitoring); *Albert*, 47 F.4th at 579-580; (same); *Matousek*, 51 F.4th at 278-80 (same); *Matney*, 80 F.4th at 1157-58 (same). Rather, for price-disparity allegations to suffice, the plaintiff must plausibly allege the comparator plans are "*meaningful* benchmarks"—that is, received recordkeeping services "equivalent to those" of the subject plan. *CommonSpirit*, 37 F.4th at 1169; *Matousek*, 51 F,4th at 280 ("[W]ithout a *meaningful* benchmark, the plaintiffs have not created a plausible inference that the [defendants'] decision-making process itself was flawed"); *Matney*, 80 F.4th at 1148 ("[T]o raise an inference of imprudence through price disparity, a plaintiff has the burden to allege a 'meaningful benchmark.'") (citation omitted).

The Complaint fails to do that. Instead, it merely alleges that 401(k) plan recordkeeping services are "commoditized" and "essentially fungible," so the services *available* to all "large" plans are "materially identical." Compl. ¶¶ 55-57. But even assuming all recordkeepers *can* provide the same scope of recordkeeping services, it does not follow that all large retirement plans *select and receive* the same services. This is no more plausible than inferring that all restaurant diners order soft drinks, because all restaurants sell them. Thus, it is unsurprising that district courts have repeatedly rejected Plaintiff's same allegations as insufficient to satisfy the meaningful benchmark requirement recently adopted by appellate courts.[11]

---

[11] *See, e.g.*, *England v. DENSO Int'l Am., Inc.*, 2023 WL 4851878, at *3 (E.D. Mich. July 28, 2023) (dismissing claims where complaint did "not set forth facts to support the contention that the [recordkeeping] services provided to mega plans are generally the same"); *Mateya v. Cook Grp. Inc.*, 2023 WL 4608536, at *4 (S.D. Ind. June 16, 2023) ("While recordkeepers may *offer* the same services to all

Moreover, the same Forms 5500 on which Plaintiff bases her price-comparison allegations undermine any inference that her four comparator plans provided the same scope or quality of recordkeeping services as the Maersk Plan. As noted, these documents identify "service codes" corresponding to the services the plan's recordkeepers provided during the year. Thus, the Form 5500 for the Maersk Plan lists four codes (15, 37, 62, 64) for the services John Hancock provided. However, *none* of Plaintiff's comparator plans reported the same combination of service codes as *either* the Plan *or* any other comparator plan.[12] In other words, "contrary to [Plaintiff's] assertions about uniformity among recordkeepers servicing large plans, the [Forms 5500] on which [s]he

---

plans, that does not mean every plan *purchases* those services."); *Miller v. Packaging Corp. of Am., Inc.*, 2023 WL 2705818, at \*5 (W.D. Mich. Mar. 30, 2023) (dismissing complaint that "provide[d] no facts to support [its] contention that the [recordkeeping] services provided to [large] plans are generally the same, or that the recordkeepers in [the complaint's] chart provided essentially the same services as" the defendant's plan); *Sigetich v. Kroger Co.*, 2023 WL 2431667, at \*9 (S.D. Ohio Mar. 9, 2023) (dismissing complaint that "fail[ed] to give any context to the services rendered to the Kroger Plan or to the services rendered to her comparable plans which may lead to the inference that the Kroger Plan's recordkeeping fees were excessive relative to the services rendered"); *Probst v. Eli Lilly & Co.*, 2023 WL 1782611, at \*10 (S.D. Ind. Feb. 3, 2023) (rejecting conclusory allegations "that all [large] plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services"); *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 267 (S.D.N.Y. 2023) ("[T]he plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range."); *Guyes v. Nestle USA, Inc.*, 2022 WL 18106384, at \*4 (E.D. Wis. Nov. 21, 2022), *R. & R. adopted*, 2023 WL 22629 (E.D. Wis. Jan. 03, 2023) ("Crucially, however, the complaint does not contain any allegations concerning the specific services performed by the comparator plans' recordkeepers or any allegations supporting a plausible inference that the plan paid more for equivalent services . . . . Absent that context, the court is left with only a naked fee-to-fee comparison, which does not permit a reasonable inference that the defendants' process of managing the plan's recordkeeping fees was imprudent."); *Krutchen v. Ricoh USA, Inc.*, 2022 WL 16950264, at \*3 (E.D. Pa. Nov. 15, 2022) (plaintiffs failed to sufficiently allege the "specific services used" by the plan and the proffered comparators); *Laabs v. Faith Techs., Inc.*, 2022 WL 17418358, at \*3 (E.D. Wis. Nov. 9, 2022), *R. & R. adopted*, 2022 WL 17417583 (E.D. Wis. Dec. 5, 2022) (conclusory allegations that defendant's plan "received a standard package of [recordkeeping] services" did not state a claim for breach of the duty of prudence).

[12] Ex. 11, Excerpts from Genesco Salary Deferral Plan 2018 Form 5500, Sched. C, Part I § 2 (service code 64); Ex. 12, Excerpts from Assoc. Materials, LLC 401(k) Ret. Plan 2018 Form 5500, Sched. C, Part I § 2 (service codes 15, 37, 50, 64); Ex. 13, Excerpts from The Boston Consulting Group, Inc. Employees' Profit Sharing Ret. Fund 2018 Form 5500, Sched. C, Part I § 2 (service codes 15, 25, 37, 52); Ex. 14, Excerpts from IBERIABANK Corp. Ret. Savings Plan 2018 Form 5500, Sched. C, Part I § 2 (service codes 13, 15, 37, 50, 64).

relies suggest that the recordkeepers in [her] chart provided different types of services for their respective clients . . ., suggesting that the particular services provided by the recordkeepers were not all the same; rather, they varied by type and/or quantity." *Miller*, 2023 WL 2705818, at *5; *see also Kroger*, 2023 WL 2431667, at *9 (same reasoning); *DENSO*, 2023 WL 4851878, at *4 (same); *Probst*, 2023 WL 1782611, at *11 (same).[13]

Finally, Plaintiff alleges that a stipulation Fidelity filed in another lawsuit involving the recordkeeping services Fidelity provided to its own 401(k) plan supports her allegation that all large plans receive the same "commoditized" recordkeeping services. Compl. ¶¶ 68-69. Plaintiff is wrong. According to the stipulation, Fidelity's own plan "*did not receive any broader* or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with *at least $1 billion in assets*[.]" *Id.* ¶ 69 (emphasis modified). From that, Plaintiff asks the Court to infer that Fidelity provides the *same* services to *all* plans with at least $1 billion in assets. But this makes no sense: that Fidelity's plan received *no broader* services than other Fidelity-recordkept plans does not mean those plans all received the *same* services—if anything, it means some or all of those plans received *broader or more valuable* services.[14] Moreover, the Plan here does not have $1 billion in assets like the plans referenced in the Fidelity stipulation, nor did Fidelity provide recordkeeping services to the Plan or any of the alleged comparator plans. In short, the Fidelity stipulation does nothing to support Plaintiff's suggestion

---

[13] Not only did the comparator plans report varying services in their Forms 5500, but Plaintiff's own chart (Compl. ¶ 89) indicates those same plans paid widely varying direct fees—exclusive of any additional indirect fees—of $40 to $51 per participant (a 24% difference). These material "differences in costs and the differences in services reported among the comparable plans suggest that even minor variations in services impact per participant recordkeeping fees." *Kroger*, 2023 WL 2431667, at *9.

[14] Indeed, Fidelity has since made clear that the stipulation "does not reflect the value of recordkeeping services that Fidelity provides to *different plans* pursuant to *different recordkeeping contracts* for a *different set of services*." *Harmon v. Shell Oil Co.*, No. 3:20-cv-0021, Dkt. 134 (S.D. Tex. Mar. 1, 2021).

that all plans receive the same recordkeeping services—let alone that the four comparators she identifies received the same recordkeeping services that the Maersk Plan received. *See Mateya*, 2023 WL 4608536, at *6 (rejecting similar allegations based on Fidelity stipulation); *Fritton v. Taylor Corp.*, 2022 WL 17584416, at *8 (D. Minn. Dec. 12, 2022) (same).

### 3. Plaintiff's Fee Comparisons Are Meaningless for Additional Reasons.

Although dismissal is warranted for the reasons above, there is yet another reason why Plaintiff's price-disparity allegations fail: She has not plausibly alleged how much her comparator Plans paid for recordkeeping services in 2018—the only year for which she estimates those fees. To the contrary, Plaintiff's own source documents demonstrate that she has materially discounted her fee estimates in at least two ways, and offered no basis for comparing the "a la carte" and "ad hoc" service fees paid by any of the plans identified in the Complaint.

*First*, Plaintiff's estimates improperly exclude recordkeeping fees paid by the employers who sponsored her comparator plans. Unlike the Maersk Plan, the Forms 5500 for each of the alleged comparators indicate that the *employer*—not the plan—pays some portion of the plan's recordkeeping fees.[15] This is important because when it comes to recordkeeping fees, the Forms 5500 report only amounts "paid by the plan"—not any additional amounts paid by the employer.[16] Because Plaintiff has only included the former (not the latter) in her fee estimates, she has not

---

[15] Ex. 11, Excerpts from Genesco Salary Deferral Plan 2018 Form 5500, Fin. Stmts., at 8 ("Certain expenses of maintaining the Plan are paid by the Plan, unless otherwise paid by the Company. Expenses that are paid by the Company are excluded from these financial statements."); Ex. 12, Excerpts from Assoc. Materials, LLC 401(k) Ret. Plan 2018 Form 5500, Fin. Stmts., at 9 ("The Employer has agreed to pay certain administrative expenses that are incurred by the Plan."); Ex. 13, Excerpts from The Boston Consulting Group, Inc. Employees' Profit Sharing Ret. Fund 2018 Form 5500, Fin. Stmts., at 10 ("The Company provides certain accounting and administrative services to the Plan at no charge and pays for the annual audit of the Plan"); Ex. 14, Excerpts from IBERIABANK Corp. Ret. Savings Plan 2018 Form 5500, Fin. Stmts., at 8 ("Certain expenses of maintaining the Plan are paid by the Plan, unless otherwise paid by the Company. Expenses that are paid by the Company are excluded from these financial statements.").

[16] *See supra* n. 12 (quoting Form 5500 for the Genesco plan and others).

plausibly alleged the *total* fees paid to her comparator-plan recordkeepers, making any comparison to the fees the Plan paid for John Hancock's services meaningless.

**Second**, although Plaintiff acknowledges that recordkeepers can be paid through direct fees, indirect fees, or both, Compl. ¶¶ 71-73, 81, 90, she only includes *direct* fees when estimating the total fees paid by her comparators. For example, Plaintiff alleges the Associated Materials plan paid $179,475 in total fees to its recordkeeper, ADP. *Id*. ¶ 89. But this includes only the "direct" fees the plan paid to ADP, and not any of the "indirect" fees the Form 5500 reports ADP also received from the plan.[17] Plaintiff does the same thing for the Boston Consulting Group plan—including direct fees but ignoring indirect fees paid to the plan's recordkeeper.[18] By ignoring the indirect recordkeeping fees paid by her comparator plans, Plaintiff has only confirmed that they provide no "meaningful benchmark" for evaluating the Maersk Plan.[19] *See, e.g.*, *Mator v. Wesco Distrib., Inc.*, 2022 WL 3566108, at *8 (W.D. Pa. Aug. 18, 2022), *appeal filed*, No. 22-2552 (3d Cir. Aug. 23, 2022) (dismissing claims that "included indirect compensation when calculating fees for [defendant's plan], while excluding it for" comparator plans); *Mateya*, 2023 WL 4608536, at *7-8 (same); *Miller*, 2023 WL 2705818, at *7 (same).

---

[17] Ex. 12, Excerpts from Associated Materials, LLC 401(k) Retirement Plan 2018 Form 5500, Sched. C, Part I § 2. In Schedule C, it discloses $179,475 in "direct" fees paid to ADP as "Recordkeeper," while also reporting "indirect compensation." *See id.*

[18] *See* Ex. 13, Excerpts from The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund 2018 Form 5500, Sched. C, Part I § 2. In Schedule C, it discloses $185,805 in "direct" fees paid to Vanguard as "Recordkeeper," while also reporting "indirect compensation." *See id.* Plaintiff, however, represents the "Total RKA Fee" for the plan as only $185,805. Compl. ¶ 89.

[19] Plaintiff claims to include an estimate of indirect payments made by her other two comparator plans, but she never explains how she did so beyond vague, generic descriptions. This inconsistent (and largely unexplained) methodology creates an apples-to-oranges calculation that prevents meaningful comparison. *See, e.g.*, *Mator*, 2022 WL 3566108, at *8; *see also Cunningham v. USI Ins. Servs., LLC*, 2022 WL 889164, at *5 (S.D.N.Y. Mar. 25, 2022) (dismissing recordkeeping fee claim in part because plaintiffs did not explain the source of indirect fee calculations); *Wehner v. Genetech, Inc.*, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021) (similar).

***Third***, Plaintiff's inclusion of "a la carte" and "ad hoc" fees in her "estimate" of the total recordkeeping fees the Maersk Plan paid further confirms the meaningless nature of her price-disparity allegations. As the Complaint explains, "a la carte" fees cover various participant-elective services, like "loan processing, brokerage services/account maintenance, distributions, services, and processing of" QDROs. Compl. ¶ 59. Thus, a plan's "a la carte" fees will be higher or lower depending on how many participants choose, for example, to take out plan loans, receive hardship distributions, or enroll in brokerage services. The same is true of "ad hoc" services, which necessarily vary from plan to plan. *See id.* ¶ 61. Accordingly, without knowing the relative volume of such services provided between two seemingly similar plans, it is impossible to meaningfully compare their *total* recordkeeping fees.

An example proves the point. Consider two plans with exactly 5,000 participants that each pay exactly $70 per participant in combined direct and indirect fees for "bundled recordkeeping services," but also pay $100 "a la carte" fees for each participant who takes out a loan. In this scenario, the participants in both plans pay a total of $350,000 for "bundled" services. However, if the participants in one plan took out 2,500 loans during the year, they would pay an additional $250,000 in fees ($600,000 in total), while the participants in the other plan who took out just 500 loans that year would pay only $50,000 in additional fees ($400,000 in total). Simply dividing the total recordkeeping fees paid by total participants—as Plaintiff does here—would suggest the plan whose participants took out more loans during the year paid recordkeeping fees of $120 per participant, while the participants in the second plan paid just $80 per participant. Under Plaintiff's flawed methodology, this result would illogically suggest that the first plan, whose participants happened to take out more loans, paid "unreasonable" recordkeeping fees (an extra $40 per participant) even though both plans had the *exact same* fee arrangement.

Here, the Complaint alleges nothing about the unit cost of "a la carte" and "ad hoc" services participants in her comparator plans paid, let alone the volume of such services provided to those plans. As the example above demonstrates, without such allegations, there can be no meaningful comparison between the total fees paid by the Plan and the total fees paid by any comparator plan. *See, e.g.*, *Matousek*, 51 F.4th at 280 (explaining that without knowing the proportion of "fees arising out of participant-initiated transactions like 'loans' and 'distributions'" there can be no meaningful comparison between defendant plan and comparator plans). This is yet another reason why Plaintiff's price-disparity allegations fail to plausibly allege any "meaningful benchmark" or otherwise state a viable claim under ERISA.

*    *    *

In sum, Plaintiff has not plausibly alleged facts supporting a reasonable inference that the Committee lacked a prudent process to monitor recordkeeping fees. Not only are her estimates about the Plan's recordkeeping fees contradicted by the very documents and statutory disclosures on which she bases them, but she has not plausibly shown that her four "comparator" plans are meaningful benchmarks for evaluating the Plan's recordkeeping fees or services. Consider further that there are thousands of retirement plans in the marketplace, so merely identifying *four* that supposedly paid less during a *single* year says nothing about the reasonableness of the fees the Plan paid for the unique services it has received since 2017—much less the process the Committee used to monitor those fees and services. At best, the Complaint shows that an enterprising plaintiff's lawyer can challenge the fees of almost any plan by scouring Form 5500 filings to identify others that may have paid less at some point in time. But nothing in ERISA requires fiduciaries to "scour the market to find and offer the cheapest possible" services, *CommonSpirit Health*, 37 F.4th at 1169, and because Rule 12(b)(6) must remain an "important mechanism" for

20

"weeding out" meritless ERISA claims, *Dudenhoeffer*, 573 U.S. at 425, more is required to avoid dismissal. For all of the above reasons, Plaintiff's excessive-fee allegations should be dismissed.

### B. Plaintiff's Discriminatory-Fee-Allocation Allegations Fail.

Next up is Plaintiff's claim that the Committee breached its fiduciary duties by allowing former-employee participants to pay more than active-employee participants—as a proportion of their Plan account balances—to cover the Plan's recordkeeping and other non-recordkeeping fees. Comp. ¶¶ 50-53, 126-27, 153-54. These allegations should be dismissed on standing grounds under Rule 12(b)(1), and because they fail to state a plausible claim for relief under Rule 12(b)(6).

### 1. Plaintiff Has No Standing to Challenge Fees She Never Paid.

Plaintiff lacks Article III standing to challenge allegedly "discriminatory" fees for the simple reason that she never paid those fees. To establish Article III standing, Plaintiff must plausibly allege: (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood the injury will be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury-in-fact element requires Plaintiff to have "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 339 (cleaned up) (citation omitted). This requirement applies equally to plaintiffs, like Plaintiff here, who seek to assert claims on behalf of themselves, others, and the relevant ERISA plan. Simply put, "[t]here is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).

Here, Plaintiff's allegations foreclose Article III standing. Plaintiff alleges that the alleged "discrimination" applied only to former-employee participants who paid proportionately larger amounts toward the Plan's recordkeeping fees than active-employee participants. However, Plaintiff never alleges that she was required to pay those higher amounts. To the contrary, Plaintiff alleges that she "rolled out" of the Plan *before* her employment terminated, and thus she was never

a *former*-employee participant in the Plan.  Compl. ¶ 24.  Having never been a former-employee participant in the Plan, Plaintiff obviously cannot have suffered any cognizable injury due to the higher amounts charged to such participants.  Accordingly, the Court should dismiss Plaintiff's fee-discrimination claim for lack of standing and jurisdiction under Rule 12(b)(1).

> **2.  The Committee Had No Duty to Ensure Fee Parity, and Regardless Plaintiff Has Not Alleged Any Resulting Losses.**

Even if Plaintiff had standing, her fee-discrimination allegations would not support a plausible claim for relief under ERISA.  Plaintiff must allege three elements:  (1) an act undertaken in a fiduciary capacity; (2) the act constituted a breach of fiduciary duty; and (3) the breached "resulted in" a loss to the Plan.  *Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*, 394 F. Supp. 2d 762, 771 (M.D.N.C. 2005).  She has failed to do so.

*First*, Plaintiff alleges no facts showing that the Plan's method of allocating fees among participants constituted fiduciary conduct.  She alleges only that plan sponsors, like Maersk, have discretion to make such allocation decisions, and then asserts that doing so in the manner alleged here violates ERISA's "fiduciary duty of loyalty and prudence."  Compl. ¶¶ 51-52.  These conclusory allegations ignore the crucial distinction between fiduciary conduct (involving ongoing plan administration) and non-fiduciary "settlor" conduct (involving plan design decisions).  When a plan sponsor, like Maersk, makes plan design decisions—such as determining how plan benefits will be funded, who will be eligible for the plan, what benefit levels will be provided, and how fees will be allocated—it is not acting in a fiduciary capacity or subject to fiduciary liability.  *See, e.g.*, *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) (explaining that the "defined functions [of a fiduciary] do not include plan design" and ERISA leaves employers "generally free . . . , for any reason at any time, to adopt, modify, or terminate . . . plans," acting "analogous to the settlors of a trust" rather than as its fiduciary) (citation omitted).  Thus, when an employer, like Maersk,

22

decides how fees will be allocated among participants, it is not acting in a fiduciary capacity and that methodology may be lawfully applied, regardless of whether it "favors a class (or classes) of participants."[20]

**Second**, even assuming fiduciary conduct, there is no fiduciary duty to ensure participants pay a proportionately equal share of plan expenses—so the failure to do so is not a fiduciary breach. As the DOL guidance Plaintiff relies upon makes clear, even when an employer expresses *no preference* for how plan expenses should be allocated, fiduciaries do not violate any duty under ERISA "merely because [their] selected method disfavors one class of participants, provided that a rational basis exists for the selected method." *Id.*; *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983) ("ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits."). That same guidance explains that a method of allocating expenses that would require *all* participants to pay the *same* fixed amount—regardless of the size of their account balance—is permissible even though it would impose a proportionately heavier burden on participants with smaller account balances who might, in turn, be less willing to participate in the plan. *See id.* Similarly, courts hold that it is lawful under ERISA to allocate recordkeeping expenses only to participants who select certain investment options that provide "revenue sharing" to the plan's recordkeeper—even though it means other participants who did not choose those options will get a free ride. *See, e.g.*, *Matney*, 80 F.4th at 1151-52 (discussing permissible use of revenue-sharing to cover plan expenses); *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009), *abrogated by Hughes*, 63 F.4th at 625 (holding that there is nothing "wrong, for ERISA purposes, in [an] arrangement" whereby "revenue sharing" is used to cover plan expenses, because "such an arrangement . . .

---

[20] DOL Field Assist. Bull. 2003-3, www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2003-03 (last visited Dec. 4, 2023)(cited in Compl. ¶ 53).

violates no statute or regulation").

Simply put, nothing in the DOL guidance Plaintiff cites or the relevant case law suggests that allocating a larger amount of recordkeeping expenses to former-employee participants is a breach of fiduciary duty. Nor does the Complaint plausibly allege that this approach was irrational or arbitrary, such that it should somehow be viewed differently than the other permissible allocation methods described above. To the contrary, it makes sense to allocate a larger share of plan recordkeeping expense to former-employee participants because the recordkeeper must do more work to maintain their records (e.g., tracking contact information, updating beneficiary designations, and other tasks) than for current-employee participants, whose demographic and other information is already maintained by the plan sponsor.

*Third*, Plaintiff has not plausibly alleged that the Plan's fee-allocation method resulted in losses. As discussed, Plaintiff never paid fees as a former-employee participant, and thus she suffered no losses resulting from the Plan's allegedly "discriminatory" fee allocation method.[21] In short, these facts are dispositive under either Rule 12(b)(1), as they foreclose standing as already discussed, or under Rule 12(b)(6), as they foreclose a necessary element of her claim.

### III. Plaintiff's Derivative Failure-to-Monitor Claim in Count II Should Be Dismissed.

Count II of the Complaint alleges that Maersk and its Board of Directors failed to monitor the Committee. *See* Compl. ¶¶ 157-63. This claim fails along with the Complaint's primary

---

[21] Even assuming Plaintiff were a former-employee participant, she could not plausibly allege that the Plan's fee-allocation method "resulted in" losses to the Plan, as required under 29 U.S.C. §§ 1109 and 1132(a)(2). Compl. ¶ 156. Under § 1132(a)(2), a participant may bring a claim "for appropriate relief under [§] 1109(a) of this title." Section 1109(a), in turn, permits claims to "recover loses *to the plan* resulting from" the alleged breach of fiduciary duty (emphasis added). Thus, claims seeking to recover losses sustained only by certain participants, and not the Plan more generally, are not available. *See LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248, 256 (2008). While former-employee participants may be disappointed that they paid a larger proportion of their account balances toward recordkeeping expenses than current-employee participants, the Plan did not suffer any losses as a result of that allocation. Rather, the total recordkeeping expense was the same regardless of how it was allocated among participants.

24

fiduciary-breach claims above, because a failure-to-monitor claim under ERISA is a derivative theory of liability. *See, e.g.*, *In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010) (dismissing claim derivative "failure to monitor" claim for same reasons); *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003) (same). In other words, just as Plaintiff's claims in Count I fail to state a viable claim under ERISA, so too her derivative breach of fiduciary duty claims in Count II fail to state a claim.

## CONCLUSION

For all of the above reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety and with prejudice.

Respectfully submitted,

*/s/ Christopher B. Boran*
Christopher B. Boran (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
110 North Wacker Drive, Suite 2800
Chicago, IL 60606
(312) 324-1000
christopher.boran@morganlewis.com

Jared R. Killeen (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5000
jared.killeen@morganlewis.com

Alexandra Price Nibert
David E. Stevens
Johnston Allison & Hord, PA
1065 E. Morehead Street
Charlotte, NC 28204
(704) 998-2221
anibert@jahlaw.com
dstevens@jahlaw.com

ATTORNEYS FOR DEFENDANTS

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been filed electronically on the 4th day of December 2023. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing.

*/s/ Christopher Boran*
Attorney for Defendants